# In re: Sandra Carolina MENDOZA-SANDINO et al., Respondents[1]

**Files A28 317 496 - Miami**
**A28 343 047**
**A28 343 049**
**A28 318 503**
**A28 318 505**

*Decided February 23, 2000*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

Pursuant to section 240A(d)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), an alien may not accrue the requisite 7 years of continuous physical presence for suspension of deportation after the service of the Order to Show Cause and Notice of Hearing (Form I-221), as service of the Order to Show Cause ends continuous physical presence.

Pro se[2]

Carlos Lopez, Assistant District Counsel, for the Immigration and Naturalization Service

Before: Board En Banc: DUNNE, Vice Chairman; SCIALABBA, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, JONES, GRANT, MOSCATO, and MILLER, Board Members. Dissenting Opinions: GUENDELSBERGER, Board Member; VILLAGELIU, Board Member; SCHMIDT, Chairman; ROSENBERG, Board Member.

JONES, Board Member:

In a decision dated October 24, 1996, an Immigration Judge granted the respondents' applications for suspension of deportation. The Immigration

---

[1]The case of the respondent whose alien number is A28 343 048 has been separated from the instant case.

[2]The record reflects that the respondents were represented in the proceedings below. The motion to withdraw as counsel by the respondents' attorney is granted. A courtesy copy of our decision will be sent to former counsel.

and Naturalization Service timely appealed.

On June 22, 1998, while the instant appeal was pending, we remanded the respondents' case to the Immigration Judge in light of section 202 of the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193, 2193 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) ("NACARA"), to provide the respondents an opportunity to apply for adjustment of status. Our order included an accompanying notice of hearing, which advised each respondent as follows:

> If you fail to appear at your scheduled hearing, your case will be returned to the Board of Immigration Appeals. The Board of Immigration Appeals will issue a decision on your appeal and/or motion to reopen. You may not file an application for adjustment of status under section 202 of the NACARA with the INS while your appeal is pending.

The record reflects that the respondents were notified by certified mail that they were scheduled to appear for a master calendar hearing before an Immigration Judge on December 17, 1998. The respondents failed to appear for the hearing. On December 17, 1998, the Immigration Judge entered a decision noting that the respondents had failed to appear and certified the case to the Board to consider the Service's previously pending appeal. *See* 8 C.F.R. § 245.13(d)(2) (1999). Therefore, we will adjudicate the underlying appeal. The appeal will be sustained and the decision of the Immigration Judge will be vacated.

## I. PROCEDURAL HISTORY

The respondents in the instant case are natives and citizens of Nicaragua. Two of the respondents entered the United States on February 28, 1986, and each was served with an Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien (Form I-221S) on March 1, 1986. The other three respondents entered the United States on June 1, 1986, and each was served with an Order to Show Cause on June 2, 1986. After their respective charging documents were issued, the respondents filed applications for asylum and withholding of deportation and motions to change venue. The respondents listed an address in Miami, Florida, in their motions to change venue, which were denied.

The respondents were scheduled to appear for hearings on their applications for asylum and withholding of deportation. The notices of hearing were mailed to the respondents' counsel, who appeared for the scheduled hearings. The respondents failed to appear, however, and counsel indicated that they had not replied to his written or telephonic communications. All of the respondents were deemed to have abandoned their applications for asylum and withholding of deportation. Two of them were granted voluntary departure and the others were ordered deported in absentia.

On April 15, 1996, the respondents filed motions to reopen to apply for suspension of deportation. The Service opposed the motions arguing that the respondents had not shown reasonable cause for their failure to appear at the scheduled hearings. On May 22, 1996, an Immigration Judge granted the respondents' motions. The Service did not appeal the Immigration Judge's decision granting the motions to reopen.

Following a hearing on October 24, 1996, on the respondents' applications for suspension of deportation, the Immigration Judge granted their requests for relief. The Immigration Judge determined that section 240A(d)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), did not apply to the respondents, as they were issued Orders to Show Cause and placed in deportation proceedings, rather than being in removal proceedings after the issuance of a notice to appear.

## II. ISSUE

On appeal, the Service argues that the Immigration Judge erred in considering the respondents' request for discretionary relief, as they were statutorily ineligible for suspension of deportation. According to the Service, the respondents were unable to establish the requisite 7 years of continuous physical presence before the service of the Orders to Show Cause because they were subject to section 240A(d)(1) of the Act and section 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-627 (effective Apr. 1, 1997) ("IIRIRA"), *amended by* NACARA § 203(a), 111 Stat. at 2196. The issue raised by the Service in this case was resolved by our decision in *Matter of Nolasco*, 22 I&N Dec. 632 (BIA 1999), which was issued subsequent to the Immigration Judge's decision. However, the dissent addresses an issue that was not raised on appeal by either the respondents or the Service.

The issue before us, therefore, is whether an applicant for suspension of deportation who has not accrued 7 years of continuous physical presence prior to the service of an Order to Show Cause may accrue the requisite continuous physical presence subsequent to its service.

## III. RECENT DEVELOPMENTS

Since the time of the respondents' deportation hearing, there have been many changes in the law regarding suspension of deportation. On September 30, 1996, Congress enacted the IIRIRA, which eliminated the relief of suspension of deportation and substituted a similar remedy, cancellation of removal, at section 240A of the Act. *See* IIRIRA §§ 304(a)(3), (a)(7), 110 Stat. at 3009-594, 3009-615. The IIRIRA's transitional rules regarding sus-

pension of deportation provided that the period of continuous physical presence stops upon the service on the alien of a charging document, which is referred to as a notice to appear. *See* section 240A(d)(1) of the Act. This "stop time" rule applies to notices to appear issued before, on, or after the IIRIRA's enactment date. *See* IIRIRA § 309(c)(5), 110 Stat. at 3009-627.

Subsequently, the NACARA revised certain sections of the IIRIRA, including the transitional provisions for suspension of deportation. *See* NACARA § 203(a), 111 Stat. at 2196. It provided that the stop time rule in section 240A(d)(1) of the Act applies to Orders to Show Cause issued before, on, or after the IIRIRA's enactment date. *Id.*

In *Matter of Nolasco, supra*, we found that section 309(c)(5)(A) of the IIRIRA, as amended by section 203(a)(1) of the NACARA,[3] applies to aliens seeking suspension of deportation. We found that service of the Order to Show Cause ends the period during which an alien may accrue the 7 years of continuous physical presence required for suspension eligibility. *Id.*

## IV. STATUTORY ELIGIBILITY FOR SUSPENSION OF DEPORTATION

In the instant case, the respondents clearly did not have the requisite 7 years of continuous physical presence prior to service of the Orders to Show Cause. The respondents' eligibility for suspension of deportation therefore hinges on whether an alien may accrue 7 years of continuous physical presence *after* the alien has been served with an Order to Show Cause, as suggested by the dissent. Based on the language of section 240A(d)(1) of the Act and the legislative history of the IIRIRA, we find that the continuous physical presence clock does not start anew after the service of an Order to Show Cause so as to allow an alien to accrue the time required to establish eligibility for suspension of deportation subsequent to the service of an Order to Show Cause.

### A. Language of Section 240A(d) of the Act

Section 240A(d) of the Act is entitled "Special Rules Relating to Continuous Residence or Physical Presence." Section 240A(d)(1) specifically relates to events that terminate an alien's continuous residence or continuous physical presence, providing as follows:

---

[3]The amended section 309(c)(5)(A) of the IIRIRA states:

IN GENERAL.—Subject to subparagraphs (B) and (C), paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to orders to show cause . . . issued before, on, or after the date of the enactment of this Act.

>    TERMINATION OF CONTINUOUS PERIOD.—For purposes of this section, any
> period of continuous residence or continuous physical presence in the United States
> *shall be deemed to end* when the alien is served a notice to appear under section 239(a)
> or when the alien has committed an offense referred to in section 212(a)(2) that ren-
> ders the alien inadmissible to the United States under section 212(a)(2) or removable
> from the United States under section 237(a)(2) or 237(a)(4), whichever is earliest.

Section 240A(d)(1) of the Act (emphasis added). This provision clearly states that the continuous physical presence or continuous residence "ends" upon the occurrence of one of the specified events, whichever is earliest. The title of section 240A(d)(1) further indicates that Congress intended the accrual of qualifying time to terminate, or permanently stop, upon the first occurrence of either of the referenced actions.

An analysis of section 240A(d)(2), which relates to the treatment of certain *breaks* in presence, further supports our finding that the clock cannot be reset so that an alien accrues continuous physical presence or continuous residence after the service of an Order to Show Cause or the commission of a specified crime. Section 240A(d)(2) specifies what periods of absence interrupting an alien's stay in this country will be deemed to break continuous physical presence, providing as follows:

>    TREATMENT OF CERTAIN BREAKS IN PRESENCE.—An alien shall be con-
> sidered to have failed to maintain continuous physical presence in the United States
> under subsections (b)(1) and (b)(2) [relating to cancellation of removal for nonperma-
> nent residents] if the alien has departed from the United States for any period in excess
> of 90 days or for any periods in the aggregate exceeding 180 days.

The language of section 240A(d) makes it clear that Congress appreciated the difference between a "break" in continuous physical presence and the "end" of continuous physical presence. Congress has distinguished between certain actions that "end" continuous physical presence, i.e., service of a charging document or commission of a specified crime, and certain departures from the country that only temporarily "break" that presence. Service of an Order to Show Cause or a notice to appear is not included as an interruptive event under section 240A(d)(2), which merely breaks continuous physical presence. Rather, under section 240A(d)(1), such service is deemed to end an alien's presence completely. Therefore, a reading of section 240A(d)(1) that would allow an alien to accrue a new period of continuous physical presence after the service of a charging document is not supported by the language of either section 240A(d)(1) or (2).[4]

---

[4]We do not find *Matter of Sipus*, 14 I&N Dec. 229 (BIA 1972), *Matter of Bufalino*, 11 I&N Dec. 351 (BIA 1965), or *Matter of V-R-,* 9 I&N Dec. 340 (BIA 1961), to be controlling on the issue of whether a new period of continuous physical presence can begin following the termination of an alien's presence. These cases were decided before the changes brought about by the IIRIRA and the NACARA, so there was at that time no legislation outlining what events broke or terminated continuous physical presence.

Unlike the dissent, we do not find that the language of section 240A(d)(1) relating to "any period" of continuous residence or continuous physical presence suggests that the clock for acquiring physical presence starts again after an Order to Show Cause or a notice to appear is served and that a new "period" of continuous physical presence begins. Section 240A of the Act encompasses three variations of cancellation of removal. Each of the three types of relief under sections 240A(a), 240A(b)(1), and 240A(b)(2) of the Act requires a different "period" of continuous physical presence or residence. To be eligible for section 240A(a) cancellation of removal, an alien must demonstrate, inter alia, 7 years of continuous residence after having been admitted to this country in any status. For section 240A(b)(1) cancellation of removal, 10 years of continuous physical presence is required. An alien applying for relief pursuant to section 240A(b)(2), however, need only show 3 years of continuous physical presence. We find that the words "*any period* of continuous residence or continuous physical presence" in section 240A(d)(1) refer to these specific "periods" of time that are required to establish eligibility for relief under sections 240A(a), 240A(b)(1), or 240A(b)(2) of the Act. These words do not suggest, as the dissent asserts, that another period of continuous physical presence can begin after an alien's presence has been terminated by the service of a charging document or the commission of a crime.

Finally, the "whichever is earliest" clause of section 240A(d)(1) of the Act also militates against any restarting of the clock, as it focuses on the first of two events, the service of the charging document or the commission of a designated crime. Were we to interpret that clause as permitting the clock to start again subsequent to the service of a charging document, we would be compelled to ignore any specified crimes committed after that time. It would be absurd to construe the "whichever is earliest" language of the statute in such a way as to allow an alien who has remained in the United States for 10 years after service of the charging document, but who thereafter committed a disqualifying crime, to have accrued a sufficient period of continuous physical presence for cancellation of removal or suspension of deportation, because the statute makes both events absolute bars to the acquisition of qualifying time. Such a construction would render the "whichever is earliest" clause superfluous.

Therefore, we find that the language of sections 240A(d)(1) and (2) of the Act reflects that service of a notice to appear or an Order to Show Cause is not simply an interruptive event that resets the continuous physical presence clock, but is a terminating event, after which continuous physical presence can no longer accrue.

## B. Legislative History

Our reading of section 240A(d)(1) of the Act is also consistent with leg-

islative history. The House Report on the Activities indicates that details on the background, specific provisions, and legislative history of the IIRIRA may be found in the following reports relating to the Immigration in the National Interest Act of 1995;[5] Report of the Committee on the Judiciary, House of Representatives, on H.R. 2202, H.R. Rep. No. 104-469 (1996) ("House Report"), and Conference Report: Illegal Immigration Reform and Immigrant Responsibility Act of 1996, H.R. Rep. No. 104-828 (1996) ("Conference Report"). *See* H.R. Rep. No. 104-879 (1996). The Conference Report's Joint Explanatory Statement of the Committee of Conference on H.R. 2202 ("Joint Explanatory Statement") contains a section-by-section explanation of the IIRIRA. *See* H.R. Rep. No. 104-828; 142 Cong. Rec. H10,841 (1996). The relevant portion of the Joint Explanatory Statement states:

> Section 240A(d) provides that the period of continuous residence or physical presence *ends* when an alien is served a notice to appear under section 239(a) (for the commencement of removal proceedings under section 240), or when the alien is convicted of an offense that renders the alien deportable from the United States, whichever is earliest. A period of continuous physical presence under section 240A(b) is *broken* if the alien has departed from the United States for any period of 90 days, or for any periods in the aggregate exceeding 180 days. The continuous physical presence requirement does not apply to an alien who has served 24 months in active-duty status in the United States armed forces, was in the United States at the time of enlistment or induction, and was honorably discharged.

H.R. Rep. No. 104-828 (emphasis added); *see also* H.R. Rep. No. 104-469 (1996).[6] The Joint Explanatory Statement reflects that the legislators understood that a break in continuous physical presence differs from the termi-

---

[5]The Immigration in the National Interest Act of 1995 was originally introduced as H.R. 1915, and reintroduced as H.R. 2202. H.R. 2202 was passed by the House on March 21, 1996. On May 2, 1996, the Senate passed H.R. 2202. On September 26, 1996, the Immigration in the National Interest Act, H.R. 2202, was renamed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

[6]In its summary of Title III of the Immigration in the National Interest Act of 1995, the House stated that "[t]he time period for continuous physical presence terminates on the date a person is served a notice to appear for a removal proceeding or if the alien is absent from the United States for an aggregate period in excess of 180 days." H.R. Rep. No. 104-469. However, in the section-by-section analysis of S. 2202, the House explained as follows:

> Subsection 240A(d) provides that the period of continuous residence or physical presence *ends* when an alien is served a notice to appear under section 239(a) (for the commencement of removal proceedings under section 240). A period of continuous physical presence is *broken* if the alien has departed from the United States for any periods in the aggregate exceeding 180 days, unless for emergent reasons the return could not be accomplished in that time.

*Id.* (emphasis added).

nation of continuous physical presence. The Joint Explanatory Statement distinguishes between events that merely break continuous physical presence, such that the clock may be reset for a new period of continuous physical presence to begin, and events that cause continuous physical presence to terminate forever.

Our reading of section 240A(d)(1) is also consistent with the House Report. In the section of the House Report entitled "Background and Need for the Legislation," the House noted areas of concern and problems that it sought to correct. Specifically, the House expressed concern about the ways in which aliens extended their stays in this country to accrue time to gain immigration benefits. The House stated the following:

> Each of these forms of relief may be exploited by illegal aliens to extend their stay in the United States. Voluntary departure is subject to abuse because there is very little assurance that aliens actually leave the United States, and very little incentive for them to do so.
>
> . . . .
>
> Asylum is often claimed by persons who have not suffered persecution, but who know that delays in adjudication (particularly in the affirmative asylum system) will allow them to remain in the United States indefinitely, meanwhile accruing time so that they will be eligible for suspension of deportation if they are ever placed in deportation proceedings.
>
> Suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued. This includes aliens who failed to appear for their deportation proceedings and were ordered deported in absentia, and then seek to re-open proceedings once the requisite time has passed. Such tactics are possible because some Federal courts permit aliens to continue to accrue time toward the seven year threshold even after they have been placed in deportation proceedings. Similar delay strategies are adopted by aliens in section 212(c) cases, where persons who have been in the United States for a number of years, but have only been lawful permanent residents for a short period of time, seek and obtain this form of relief.

H.R. Rep. No. 104-469. The House and Conference Reports make it clear that the legislators intended to remove the incentive for aliens to prolong their cases in the hope of remaining in the United States long enough to be eligible for relief from deportation. *Id.* Therefore, reading section 240A(d)(1) to allow an alien to accrue a new period of continuous physical presence after the issuance of a charging document would be contrary to the intent of Congress as expressed in the legislative history of the IIRIRA.

## V. CONCLUSION

The respondents were served with Orders to Show Cause before they acquired the 7 years of continuous physical presence necessary to establish

their statutory eligibility for suspension of deportation.[7] *See* IIRIRA § 309(c)(5), *amended by* NACARA § 203(a)(1); *Matter of Nolasco, supra.* Furthermore, the respondents' presence in this country after the service of the Orders to Show Cause cannot be counted toward accrual of the required 7 years of continuous physical presence. Therefore, we conclude that the respondents are not statutorily eligible for the requested relief. Accordingly, the Service's appeal will be sustained and the decision of the Immigration Judge granting the respondents suspension of deportation will be vacated.

**ORDER:** The appeal of the Immigration and Naturalization Service is sustained and the Immigration Judge's decision is vacated.[8]

**FURTHER ORDER:** The respondents are ordered deported from the United States.

*DISSENTING OPINION:* John Guendelsberger, Board Member

I respectfully dissent.[1] On October 24, 1996, the Immigration Judge granted suspension of deportation to the respondents in this case. The Immigration and Naturalization Service has appealed, claiming that the respondents have not demonstrated 7 years of continuous physical presence as required by former section 244(a) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a) (1994). The Service has not appealed the Immigration Judge's determinations that the respondents have demonstrated that deportation would cause them extreme hardship and that they meet the good moral character requirement of section 244(a).

The majority holds that, under section 240A(d)(1) of the Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), service of an Order to Show Cause and Notice of Hearing (Form I-221) not only terminates the period of physical presence acquired up to that point (if less than 7 years), but also precludes the accrual of a subsequent period of physical presence for suspension eligibility. Such a broad reading of section 240A(d)(1) is not supported by

---

[7]We find *Matter of Pena-Diaz*, 20 I&N Dec. 841 (BIA 1994), to be inapposite. In *Matter of Pena-Diaz*, we stated that the Service's intentional lack of enforcement of a final order of deportation could be considered in deciding whether to grant reopening as a matter of discretion. Here, the issue is whether the respondents are statutorily eligible for suspension of deportation. *See Matter of Pena-Diaz, supra*, at 846 (stating that "[b]efore a motion or any form of discretionary relief may be granted, an alien must first establish statutory eligibility . . . [because] only then does the issue of the proper exercise of discretion present itself").

[8]We note that an alien who is subject to a final order of exclusion, deportation, or removal, and who has not been denied adjustment of status under section 202 of the NACARA by an Immigration Judge or the Board of Immigration Appeals, may apply to the Service for adjustment of status under that section of the NACARA. 8 C.F.R. § 245.13(d)(4).

[1]I also agree with the dissenting opinions of Chairman Schmidt and Board Member Villageliu.

either the wording or the legislative history of that provision.

In *Matter of Nolasco,* 22 I&N Dec. 632 (BIA 1999), we held that, in determining eligibility for suspension of deportation, service of the Order to Show Cause ends the period of continuous physical presence. In that case, the respondent had entered the United States in May of 1989. The Order to Show Cause was served in March of 1996. Based on section 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-627 ("IIRIRA"), as it was amended by the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) ("NACARA"), and section 240A(d) of the Act, we found that service of the Order to Show Cause on the respondent terminated his period of continuous physical presence. Because the respondent in *Nolasco* had not acquired 7 years of residence subsequent to service of the Order to Show Cause, we did not have occasion there to consider whether physical presence after service of the Order to Show Cause could count toward eligibility for suspension of deportation.

In this case, each of the respondents accrued well over 7 years of physical presence *after* service of the Order to Show Cause. Two of the respondents entered the United States on February 28, 1986, and were served with Orders to Show Cause on March 1, 1986. The other three respondents entered the United States on June 1, 1986, and were served with Orders to Show Cause on June 2, 1986. All five respondents applied for suspension of deportation in 1996, and all have now resided in the United States for over 13 years since the service of an Order to Show Cause. The issue here is whether the period of physical presence after service of the Order to Show Cause may be considered for purposes of section 244(a) suspension eligibility.

Resolution of this issue turns upon whether the physical presence "clock," once interrupted, falls silent forever or commences a new period of continuous physical presence. The starting point in resolving this issue is the language of section 240A(d)(1) of the Act, which states:

> TERMINATION OF CONTINUOUS PERIOD.—For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a) or when the alien has committed an offense referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2) or removable from the United States under section 237(a)(2) or 237(a)(4), whichever is earliest.

Notably, the core statement that "*any period* of continuous physical presence . . . shall be deemed to end" strongly suggests that there may be more than one period to be considered. Although section 240A(d) clearly cuts off the accrual of a period of time *prior to* a specified event, it does not

speak to periods of time *after* the event in question. The reference to ending "any period" of physical presence suggests that another period of physical presence ensues. *See Arrozal v. INS*, 159 F.3d 429, 434 n.2 (9th Cir. 1998) (recognizing that under section 240A(d)(1) a respondent "might satisfy the continuous physical presence requirement by virtue of the fact that she has accrued twelve years of continuous physical presence *since* the INS issued her an order to show cause").

Calculation of continuous physical presence under former section 244(a) depends upon the grounds of deportability charged. Respondents deportable under most noncriminal grounds must demonstrate 7 years of continuous physical presence "immediately preceding the date of [the suspension] application." Section 244(a)(1) of the Act. Respondents deportable under most criminal grounds, however, must demonstrate 10 years of physical presence "immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation." Section 244(a)(2) of the Act; *see also, e.g., Leon-Hernandez v. INS*, 926 F.2d 902 (9th Cir. 1991); *Brown v. INS,* 856 F.2d 728 (5th Cir. 1988).

Under these distinct approaches to calculating physical presence, an alien who had entered without inspection and had begun to acquire time that would count toward eligibility for suspension of deportation under former section 244(a)(1), would, upon the commission of an act or assumption of a status constituting a ground for deportation listed under former section 244(a)(2), lose any credit for such physical presence and would have to restart the physical presence clock from the time of the section 244(a)(2) event. The physical presence clock under section 244(a)(2) would also stop and begin again upon the occurrence of a subsequent section 244(a)(2) event. *See Matter of Bufalino*, 11 I&N Dec. 351 (BIA 1965) (finding that a respondent who is deportable under several grounds, one of which is listed in section 244(a)(2), is ineligible for relief under section 244(a)(1) and must establish eligibility under section 244(a)(2) of the Act from the date of the commission of the last deportable act); *Matter of V-R-*, 9 I&N Dec. 340, 342 (BIA 1961) (stating that when there is more than one section 244(a)(2) event, the 10-year period of physical presence for suspension is computed from the date of the last such event). The interplay between eligibility for suspension under the physical presence requirements of section 244(a)(1) and (2) has always involved the potential for the ending of one period of physical presence and the start of another. These provisions of sections 244(a)(1) and (2) remain intact and applicable to respondents in proceedings prior to the effective date of the IIRIRA. Thus the resetting of the physical presence clock upon the occurrence of particular events has been and remains inherent in the eligibility provisions for suspension of deportation.

The majority's reading of section 240A(d)(1) of the Act to end all periods of continuous physical presence upon the occurrence of a section 240A(d)(1) event sweeps far too broadly. Under such a reading, no appli-

cant for suspension could ever qualify for relief under section 244(a)(2), because a period of physical presence would end with commission of the crime and a respondent would be barred from relying upon a subsequent period of 10 years of physical presence following the conviction for the crime. Section 244(a)(2), however, requires only that the respondent show 10 years of continuous physical presence after the conviction for a crime included in former section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2) (1994). A second period of continuous physical presence has always been required in any suspension case under section 244(a)(2). After the IIRIRA, service of an Order to Show Cause or commission of another offense listed in section 240A(d)(1) will terminate this second period of physical presence, but until such an event occurs, the clock runs under section 244(a)(2) from the time of conviction for the crime. *Matter of Lozada*, 19 I&N Dec. 637 (BIA) (holding that the relevant date for calculating continuous physical presence under section 244(a)(2) is the date of *conviction* rather than the date of commission of the section 241(a)(2) offense for which deportation is sought), *aff'd*, 857 F.2d 10 (1st Cir. 1988); *cf. Matter of Perez,* 22 I&N Dec. 3389 (BIA 1999) (finding that under section 240A(d)(1) physical presence ends upon the *commission* of a qualifying criminal offense).

Had Congress intended the occurrence of a section 240A(d)(1) event to bar all future eligibility for relief and to preclude the possibility of accruing time toward continuous physical presence, it would have clearly stated that the occurrence of such an event prior to the accrual of 7 years of continuous physical presence renders a respondent ineligible for suspension of deportation. *See, e.g.,* section 240A(c) of the Act (setting forth categories of aliens ineligible for relief). Instead, the "special rules" relating to continuous physical presence are set forth in a separate provision. This arrangement suggests that while the occurrence of an event specified in section 240A(d) breaks continuity of physical presence, it does not preclude the applicant from ever again accruing the required years of continuous physical presence. *See Arrozal v. INS, supra*.

Notably, former section 244(a)(1) of the Act and its replacement provision for cancellation of removal enacted by the IIRIRA, section 240A(b)(1)(a), require that the alien be physically present in the United States for a continuous period of time (not less than 7 years for suspension of deportation and 10 years for cancellation of removal) "*immediately preceding* the date of [the] application" for suspension of deportation or cancellation of removal. (Emphasis added.) This statutory focus on the time period immediately preceding the application is consistent with a reading of the statute which recognizes that 7 years of continuous physical presence might be acquired after service of an Order to Show Cause. The rules of statutory construction presume that words of a statute repeated in subsequent legislation for the same purpose have the same meaning, because Congress is aware of the prior construction. 1A Norman J. Singer,

*Sutherland Statutory Construction* §§ 22.33, 22.35, at 288, 296 (4th ed. 1985); *Lorillard v. Pons*, 434 U.S. 575, 581 (1978); *Matter of K-,* 20 I&N Dec. 418, 423 (BIA 1991). Had Congress intended the reading of section 240A(d)(1) adopted by the majority, it would not have included the "immediately preceding" clause in the eligibility requirements for cancellation of removal.

Comparison of the wording used in section 240A(d)(2) also suggests that a second period of continuous physical presence may occur under section 240A(d)(1). Section 240A(d)(2) provides a bright-line rule for determining whether continuity of physical presence is broken by trips outside the United States. It states that one who departs for over 90 days "shall be considered to have *failed to maintain* continuous physical presence." Section 240A(d)(2) of the Act (emphasis added). The "failed to maintain" language is just as final and conclusive as the words "terminated" and "deemed to end" in section 240A(d)(1). The physical presence that ends with too long a departure, however, begins anew upon return to the United States. Similarly, the termination of a period of physical presence under section 240A(d)(1) does not necessarily preclude a subsequent period of physical presence.

Section 240A(d)(1) does not clearly preclude the accrual of physical presence after the occurrence of an event that has terminated a prior period of physical presence. Nor does our holding in *Matter of Nolasco, supra*. Our role in such a situation is to resolve doubts in favor of affording relief from deportation. *See INS v. Errico*, 385 U.S. 214, 225 (1966) (stating that doubts as to the correct construction of a statute should be resolved in the alien's favor when interpreting provisions related to relief from deportation). We resolve doubts in favor of the more narrow construction because deportation is a drastic measure and at times the equivalent of banishment or exile. *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948). In the absence of a clear legislative directive that physical presence after service of an Order to Show Cause may not be considered, we should not read such a restriction into section 240A(d)(1). We should not assume, without more, that Congress meant to restrict eligibility beyond that required by the narrower version of reasonable interpretations of the words used.

The legislative history referred to by the majority provides scant support for the proposition that Congress intended the most restrictive of the possible readings of the statutory language. When 7 years of continuous physical presence has not been acquired by the time of service of the Order to Show Cause, requiring a new period of 7 years of physical presence after the start of proceedings largely accomplishes the goals of Congress. Delay in reaching a final order in proceedings beyond 7 years is not always attributable to the alien. In those rare cases in which 7 years have gone by since the start of pro-

ceedings, and the alien is primarily at fault, whether suspension should be granted remains subject to the exercise of administrative discretion.

In the instant case, the respondents accrued more than the requisite 7 years of continuous physical presence after service of the Orders to Show Cause and before they filed their applications for suspension. Because the Immigration Judge correctly determined that they were eligible for suspension of deportation, I would affirm the Immigration Judge's order granting relief to each of the respondents in this case.

*DISSENTING OPINION:* Gustavo D. Villageliu, Board Member

The question before us is what should be deemed to end upon service of an Order to Show Cause. Is it only a period of continuous physical presence that began before such service, or also other periods of continuous physical presence that had not already started when the Order to Show Cause was served? In short, does the statute end all further continuous physical presence or only the continuity of the period of physical presence that had already begun, as the court suggests in *Arrozal v. INS*, 159 F.3d 429, 434 n.2 (9th Cir. 1998)?[1]

The respondents have, in fact, been continuously present in the United States for the requisite 7 years, because they entered in 1986. Moreover, subsequent to the service of their Orders to Show Cause in 1986, they also have accrued a period of continuous physical presence that exceeds the minimum 7 years immediately preceding their October 24, 1996, applications for relief. The majority rules that neither period of continuous physical presence suffices, however, because once the original period of continuous physical presence is deemed to end, no other period of continuous physical presence may begin. This conclusion is not supported by either logic or any specific language in the statute.

Because of the drastic consequences of deportation, the rules of statutory interpretation relating to immigration statutes require that all remaining ambiguities be construed in the favor of the alien. *See INS v. Errico*, 385 U.S. 214 (1966); *Barber v. Gonzales,* 347 U.S. 637 (1954); *Fong Haw Tan v. Phelan*, 333 U.S. 6 (1948). Notwithstanding, the majority broadly rules that neither of these continuous periods of physical presence in the United States can qualify as the "seven years immediately preceding the date of such application" that are required under former section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1994), for sus-

---

[1]Although I entirely agree with the dissenting opinions of Chairman Paul W. Schmidt and Board Member John Guendelsberger, I also respectfully dissent separately in order to specifically refute some of the majority's assertions, which cannot be adequately covered in those dissenting opinions without detracting from their clarity.

pension of deportation. *See Landgraf v. U.S.I. Film Products*, 511 U.S. 244, 269 (1994); *accord Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) (reading narrowly the limitations on relief from deportation and judicial review prescribed by AEDPA § 440(d) and the transitional rules provisions of IIRIRA § 306, respectively); *Lindh v. Murphy*, 521 U.S. 320 (1997); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997); *cf. Shah v. Reno*, 184 F.3d 719 (8th Cir. 1999); *Sandoval v. Reno*, 166 F.3d 225 (3d Cir. 1999); *Henderson v. INS,* 157 F.3d 106 (2d Cir. 1998) *Goncalves v. Reno*, 144 F.3d 110 (1st Cir. 1998), *cert. denied*, 119 S. Ct. 1140 (1999). For these reasons, we should instead look closely at the actual language of section 240A(d)(1) of the Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), before adopting a broad rule retroactively reversing a 1996 grant of suspension of deportation.[2] Section 240A(d)(1) of the Act provides as follows:

> TERMINATION OF CONTINUOUS *PERIOD.—For purposes of this section, any period* of *continuous residence* or *continuous physical presence* in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a) or when the alien has committed an offense referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2) or removable from the United States under section 237(a)(2) or 237(a)(4), *whichever is earliest.* (Emphasis added.)

## I. THE MAJORITY'S CONCLUSION BEGS THE QUESTION

The majority concludes that upon service of an Order to Show Cause all possible periods of continuous physical presence or continuous residence required for relief under sections 240A(a), 240A(b)(1), or 240A(b)(2) of the Act must end. It then applies this rule by analogy to relief under former section 244(a)(1) of the Act, citing *Matter of Nolasco*, 22 I&N Dec. 632 (BIA 1999), as authority. However, the majority's reasoning is faulty and begs the ultimate question. It assumes as unquestionable the premises that section 240A(d)(1) indicates that "the continuous physical presence or continuous residence 'ends' upon the occurrence of one of the specified events" such as the service of a notice to appear or the commission of a criminal offense and that "the statute makes both events absolute

---

[2]The effective date of the amendments made by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), is April 1, 1997. However, the transitional rule § 309(c)(5) of the IIRIRA, 110 Stat. at 3009-627, applies section 240A(d)(1) to pending cases. This transitional rule was further amended by the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) ("NACARA").

bars to the acquisition of qualifying time." *Matter of Mendoza-Sandino*, 22 I&N Dec. 1236, at 1240-41 (BIA 2000).

Starting from such premises, the majority understandably reaches an identical conclusion. However, what the statute actually says is that "any period" of continuous residence or continuous physical presence in the United States is "deemed to end." It does not say that any other periods of continuous physical presence or residence are barred. We need to consider what the words "any period" mean as they relate to "continuous residence or continuous physical presence," without first assuming as a premise that all "continuous residence or continuous physical presence" ends.

It is well settled that no provision of law should be construed so as to render a word or clause surplusage. *Kungys v. United States*, 485 U.S. 759 (1988); *Colautti v. Franklin*, 439 U.S. 379 (1979). Moreover, a relevant intrinsic aid for statutory interpretation is the princi ple of noscitur a sociis, which states that words in a statute take their meaning based on their context or their association with other words in the statute. *See United States v. Limehouse*, 285 U.S. 424, 426 (1932). By treating the words "any period" as mere surplusage, the majority obscures the fact that what the language of the statute deems ended de jure is only the continuity of a de facto period of time, not all future periods of continuous physical presence or residence in the United States.

Focus first on the assertion that no further continuous residence may accrue because the period of continuous residence in the United States is deemed ended by section 240A(d)(1) of the Act. That is clearly incorrect. It is a well-settled principle of immigration law that the period of lawful residence does not end when a charging document seeking to remove a lawful permanent resident from the United States is served pursuant to 8 C.F.R. § 3.13 (1999) or filed commencing proceedings pursuant to 8 C.F.R. § 3.14 (1999). A lawful permanent resident who commits a removable or deportable offense remains a lawful permanent resident until an administratively final order of removal or deportation deprives him of that status. *See Matter of Ayala*, 22 I&N Dec. 398 (BIA 1998); *Matter of Lok*, 18 I&N Dec. 101 (BIA 1981), *aff'd*, 681 F.2d 107 (2d Cir. 1982); 8 C.F.R. § 1.1(p) (1999).

Because such a respondent's residence has not ended, there is clearly, both de facto and de jure, a period of lawful permanent residence between the time the Order to Show Cause is issued and the time an administratively final deportation order depriving him of his residence is issued. In fact, both section 240A(a) of the Act and its predecessor, former section 212(c) of the Act, 8 U.S.C. § 1182(c) (1994), require that the respondent be in status as a lawful permanent resident in order to apply for these forms of relief. *See Matter of Duarte*, 18 I&N Dec. 329 (BIA 1982), and cases cited therein; *cf.* 8 C.F.R. § 212.3(f) (1999). Consequently, because an alien's residence does not end de jure upon either the commission of a crime or service of the Order to Show Cause, the only thing logically left to deem ended

de jure under section 240A(d)(1), for purposes of relief, is the continuity of his actual period of residence.

Moreover, the majority's reliance on the words "whichever is earliest" in section 240A(d)(1) is unconvincing. It also assumes as a premise that what the statute ends is residence or physical presence, treating as surplusage the words "any period" and "continuous" by asserting that "the statute makes both events absolute bars to the acquisition of qualifying time." *Matter of Mendoza-Sandino, supra*, at 1240-41. It is entirely consistent with both logic and the statute for consecutive periods of time to exist, and to have a period of time end upon commission of a crime and a subsequent period of time end when an alien is served with a charging document seeking his removal from the United States.[3]

In any event, the language "whichever is earliest" clearly relates to when the period of continuous physical presence is deemed to end because of a crime that renders an alien inadmissible or removable. It specifically addresses our ruling in *Matter of Bufalino*, 11 I&N Dec. 351 (BIA 1965), that the requisite 10-year period of continuous physical presence required for criminals seeking suspension of deportation under former section 244(a)(2) runs from the last deportable act. *Accord Matter of V-R-,* 9 I&N Dec. 340 (BIA 1961). Because it specifically addresses another form of suspension relief, it has questionable relevance to the issue of continuous periods of physical presence accrued by noncriminal aliens for section 244(a)(1) suspension of deportation purposes.

Similarly, referring to a general legislative intent in 1996 to end exploitation of suspension relief by aliens who are residing in the United States unlawfully does not relieve us from closely examining the statute under the applicable rules of statutory interpretation. This 1996 general intent must be viewed in context with the 1997 NACARA amendments, which prescribed a more discrete application of the IIRIRA § 309(c)(5) transitional rules, and the general purpose of the suspension statute, which was to provide relief to aliens who had resided in the United States, albeit illegally, for a long time.

The respondents in this case are Nicaraguans who were allowed to

---

[3]This is particularly pertinent because we have recently ruled that some crimes that were not previously deportable offenses became so retroactively as a result of the IIRIRA, and aliens are now placed in proceedings for crimes committed long ago, at a time when a conviction for such crimes did not impose deportability. *See Matter of Truong*, 22 I&N Dec. 1090 (BIA 1999). This period of lawful residence subsequent to the commission of a crime that later became a removable offense is also a continuous period of residence that would be deemed to end upon service of a notice to appear, in a narrower, more logical reading of section 240A(d)(1). A legislative intent to discourage aliens who are residing here unlawfully from prolonging their illegal stay clearly does not apply to lawfully residing aliens who previously were not even deportable.

remain in the United States from 1987 to 1995 under the Attorney General's Nicaraguan Review Program. *See Matter of L-O-G-,* 21 I&N Dec. 413, 421 (1995). Indeed, the NACARA afforded this specific class of aliens the opportunity to apply for the substantially greater relief of adjustment of status. To interpret section 240A(d)(1) so broadly as to preclude suspension relief based on general legislative intent, without taking into account the subsequent NACARA clarification of such intent, ignores that a similarly broad interpretation of the statute was vacated by the Attorney General in *Matter of N-J-B-,* 22 I&N Dec. 1057 (BIA 1997; A.G. 1997, 1999), and led to the enactment of the NACARA.

## III. NOT ALL PROCEEDINGS RESULT IN DEPORTATION ORDERS

A major shortcoming in the majority's reasoning is its failure to address the possibility that the outcome of the proceedings may be favorable to the alien. It mistakenly assumes that every proceeding to remove an alien from the United States results in an order of deportation or removal. However, that is not necessarily the case.

The proceedings may result in a finding that the respondent is not deportable or removable, or the Service may move to terminate the proceedings as improvidently begun, pursuant to 8 C.F.R. § 239.2 (1999). Also, relief from deportation or removal may be granted to the respondent during these proceedings. Under the majority's reasoning, all future periods of continuous residence or physical presence would be ended by the initiation of proceedings, even if the respondent obtains or retains lawful permanent resident status after such proceedings are completed. Consequently, no alien whose status is adjusted pursuant to section 245 of the Act, 8 U.S.C. § 1255 (1994 & Supp. II 1996), after being placed in proceedings would acquire continuous residence or continuous physical presence, despite having already been granted lawful permanent resident status. This makes no sense.

It is absurd to conclude that an alien whose proceedings are terminated because he is not deportable or removable can no longer accrue continuous residence or physical presence for purposes of any future application for relief from deportation simply because an Order to Show Cause was issued in his case. Yet that is the inevitable result of precluding further continuous physical presence for purposes of relief after the service of an Order to Show Cause.

In addition, the majority's reasoning renders surplusage another provision of the Act, which precludes aliens granted some forms of relief from deportation, but not recipients of other relief, from cancellation of removal. *See* section 240A(c)(6) of the Act. Because no statute should be interpreted so as to render another portion of the statute mere surplusage, we should look for a more reasonable interpretation of the statute that makes more sense.

## IV. THE LANGUAGE OF THE STATUTE DOES NOT PRECLUDE ANOTHER PERIOD OF CONTINUOUS PHYSICAL PRESENCE

The majority concludes that nothing in the language of the statute suggests that another period of continuous physical presence can occur subsequent to service of an Order to Show Cause. As discussed above, there clearly exist other subsequent continuous periods of time while proceedings are pending, or if proceedings are terminated. More importantly, the majority asks the wrong question. Because the alien has, in fact, been here continuously for the requisite 7 years "immediately preceding the application," the question should be whether the statute requires otherwise, precluding de jure what exists de facto. It does not.

A statute should be strictly construed if it purports to repeal previous law. *See United States v. Noce*, 268 U.S. 613 (1925); *Frost v. Wenie*, 157 U.S. 46 (1895); *cf.* 2A Norman J. Singer, *Sutherland Statutory Construction* § 58.03, at 711 (4th ed. 1984). As one court explained, "Where an act purports to overturn long-standing legal precedent and completely change the construction placed on a statute by the courts, . . . it [must] be done in unmistakable language." *State ex rel. Hous. Auth. of Plant City v. Kirk*, 231 So. 2d 522, 524 (Fla. 1970); 2A Singer, *supra* § 58.03, at 711. As discussed below, the well-settled precedents interpreting "continuous physical presence" for purposes of suspension of deportation contemplate successive periods of continuous physical presence. The language "any period of continuous physical presence shall be deemed to end" does not necessarily mean that all periods, including those that have not started, must end.

The word "any" in section 240A(d)(1) does not mean "all" or "every." "All" means the whole number, amount or quantity, the total extent, the whole possible. *Webster's II New Riverside University Dictionary* 93 (1984) [hereinafter *Webster's*]. "Every" means "all," without exception. *Id.* at 448. "Any" instead merely means "one or some, regardless of sort, quantity or number, one or another selected at random." *Id.* at 115. We cannot infer that the word "any" means "all" or "every," in context with the phrase "period of continuous physical presence shall be deemed to end," without violating the principle of noscitur a sociis discussed above.

It is an axiom of statutory construction that words in a statute should be given their ordinary meaning whenever possible. 2A Singer, *supra* §§ 46.01, 46.04, at 73, 86. The word "period" means "an interval of time." *Webster's, supra*, at 874. Putting the words "any period" in context with the words "continuous physical presence" cannot logically refer to a period of time whose continuity would be ended before the period of time even begins because, logically, continuity would not transcend its own ending. That is simply not the ordinary meaning of the word "period" as it relates to continuity.

The word "end" is a boundary, a point at which an act, event, or phe-

nomenon ceases or is completed. *Webster's, supra*, at 430-31. Periods of time are discrete units with a beginning and an end, consistent with an event that terminates continuity of an interval of time but does not affect other periods of time as to their continuity. Once the period of continuous physical presence is deemed to end, nothing in the statute prevents another continuous period of physical presence from beginning, consistent with reality and the normal meaning of the words "continuous period." That is the normal reading of a statute that mandates the ending of a period of time upon the occurrence of a specified event.

The statute does not say that all periods of time shall be deemed to end. It also does not say that any continuous physical presence shall be deemed to end. Either of these alternatives may conceivably be read to require ending a period of time that had not yet begun, assuming arguendo that the rule prescribing that ambiguities in deportation statutes be interpreted in the favor of the alien is inapplicable to this task.

In addition, because Congress was already clarifying in the NACARA what that specific language meant for purposes of suspension of deportation, there is no basis for our further interpretive gloss. After all, if Congress intended the statute to provide that no further time would accrue for purposes of relief, it could say so clearly and directly, in accordance with the long-settled principles of statutory interpretation that are required when a legislature purports to repeal previous law. Instead, what the statute mandates is the end of an interval of time. It states that "any period of continuous physical presence . . . shall be deemed to end," necessarily implying a reference to discrete periods of time already existing and ending when the specified event, service of a notice to appear, takes place.

This is how the Supreme Court used the words "period of time" as recently as 1993 in *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 46-50 (1993), when discussing periods of time during which applications for legalization under the 1986 "IRCA" statute could be submitted. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359. It meant a time interval during which applications for legalization could be submitted. That is also how we interpreted the legal significance of the ending of a period of continuous physical presence for purposes of suspension of deportation in *Matter of Sipus*, 14 I&N Dec. 229, 230 (BIA 1972), where we specifically ruled that, after a period of continuous physical presence ended because of a departure from the United States, another period began that met the 7-year minimum required for suspension of deportation. It is another axiom of statutory interpretation that Congress is presumed to be aware of how identical statutory language has been interpreted in the past. 1A Norman J. Singer, *Sutherland Statutory Construction* §§ 22.33, 22.35, at 288, 296 (4th ed. 1985); *Lorillard v. Pons*, 434 U.S. 575, 581 (1978); *Matter of K-,* 20 I&N

Dec. 418, 423 (BIA 1991); *Matter of Rodriguez-Coto*, 19 I&N Dec. 208 (BIA 1985)[4]

The majority's reference to section 240A(d)(2) as evidence of a different intent, because it refers to failing "to maintain continuous physical presence," is misplaced. This alternative phrasing was clearly aimed at amending the language of section 244(b)(2) of the Act, which had a separate legislative history. *See supra* note 4. The words "failed to maintain" have consistently been used as a synonym for "ending" by Congress and the courts. *See Security Services, Inc. v. K Mart Corp.,* 511 U.S. 431, 446 (1994); *United States v. Gaubert*, 499 U.S. 315, 326 (1991); *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 20 (1981). Consequently, because both sections 240A(d)(1) and (2) preclude eligibility for relief in a similar manner, the language of section 240A(d)(2) is evidence that Congress used the phrases "deemed to end" and "failed to maintain" interchangeably.

In determining whether an applicant for suspension of deportation has the requisite 7 years of continuous physical presence in the United States "immediately preceding" the suspension of deportation application, we should focus on the time period "immediately preceding the application" in accordance with the language of the statute. If no event that "deemed to end" its continuity took place during that period of time, the respondents are eligible to apply for suspension of deportation because they have "been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application." Section 244(a)(1) of the Act; *see also Matter of Dilla*, 19 I&N Dec. 54 (BIA 1984); *Matter of Sipus, supra*. I therefore dissent from the majority's ruling and agree with the dissenting opinions of Chairman Schmidt and Board Member Guendelsberger.

*DISSENTING OPINION:* Paul W. Schmidt, Chairman

I agree with the dissenting opinions filed by Board Members Guendelsberger and Villageliu.

Their respective opinions correctly point out that a narrow construction

---

[4]The phrase "continuous physical presence" is a well-developed concept in immigration law for purposes of relief from deportation, both through case law and relatively recent legislation. *See Matter of Dilla*, 19 I&N Dec. 54 (BIA 1984) (adopting the Supreme Court's strict interpretation of the term "continuous physical presence"); former section 244(b)(2) of the Act (abrogating the Supreme Court's strict interpretation); section 245A(a)(3)(B) of the Act, 8 U.S.C. § 1255a(a)(3)(B) (1994) (prescribing the more liberal "brief, casual, and innocent" test for legalization purposes). We recognized that each period of continuous physical presence was a separate period that may or may not be deemed continuous for purposes of suspension of deportation, depending on the applicable statute. *Matter of Dilla, supra*, at 55; *cf. De Gurules v. INS*, 833 F.2d 861 (9th Cir. 1987).

of the "stop time" disqualification clause is consistent with the statutory language and with the principles of statutory interpretation that should be applied in immigration cases.

The consequences of the majority's construction of the stop time rule will be harshest for a group of aliens where the Immigration Judge granted suspension of deportation, the Immigration and Naturalization Service appealed, and the case has been pending on appeal for many years. Those cases will now be subject to mandatory denial without regard to the under-lying merits.

In such cases, the delays are not caused by the applicants, who did not invoke the appellate process and have no practical control over the timing of such adjudications. The Service cannot be faulted for exercising its regulatory right to appeal. Nor can we, as a body responsible for fairly completing more than 23,000 appellate adjudications in each of the past 3 years, reasonably be expected to make everyone's case a "priority." Expansion of our membership and the recently enacted regulatory framework for streamlined appellate adjudications offer hope for the future. *See* Streamlining: Final Rule, 64 Fed. Reg. 56,135 (1999). Nevertheless, lengthy delays in some nondetained case appeals are simply an unfortunate fact of life in our current system.

By denying us the opportunity to exercise our discretion in a reasoned manner, the majority's construction of the stop time rule is likely to lead to miscarriages of justice, which no reasonable legislator could have foreseen or intended.

For the foregoing reasons, I join my colleagues in respectfully dissenting.

*DISSENTING OPINION:* Lory Diana Rosenberg, Board Member

I respectfully dissent and join the dissents of Chairman Schmidt and Board Members Guendelsberger and Villageliu.