**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-60349
_____


MANDANA KASHANIAN MCBRIDE,
also known as Mandana Kashanian Milne,

                                             Petitioner,

versus

IMMIGRATION AND NATURALIZATION SERVICE,

                                             Respondent,


_____

No. 99-60610
_____


MEHRANGIZ EGHBAL PIXLEY,

                                             Petitioner,

versus

IMMIGRATION AND NATURALIZATION SERVICE,

                                             Respondent.

- - - - - - - - - -
Petition for Review of an Order of
the Board of Immigration Appeals
- - - - - - - - - -

January 19, 2001

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

    Petitioners Mandana Kashanian Milne, previously known as Mandana

1

Kashanian McBride ("Milne"), and Mehrangiz Eghbal Pixley are aliens whose petitions for suspension of deportation were denied and who now face deportation. They contend that the Board of Immigration Appeals ("BIA") erred in denying their respective petitions for suspension of deportation because they were not continuously present in the United States for at least seven years before receiving notice of the commencement of deportation proceedings against them. Although each petitioner concedes that she had not been present for the required seven years at the time that she was served with an order to show cause[1] (notifying her of the commencement of deportation proceedings), both argue that, because they have been continuously present in the United States for more than seven years since receiving the show cause order, they are eligible to petition for suspension of deportation. They thus ask us to reverse the interpretation of the BIA that § 240A(d)(1) of the Immigration and Naturalization Act[2] ("the stop-time rule") not only terminates the running of the clock for continuous presence accrued up to the time that the alien is served with notice of deportation proceedings but also prevents that clock from beginning to run anew thereafter.

Given the deference that we owe to the BIA's interpretation of statutes involving immigration matters and the cogent reasoning that it has advanced in support of its interpretation of the stop-time rule, we

_____

[1] The term "notice to appear" has since replaced the previously employed term "order to show cause."

[2] 8 U.S.C. § 1229b(d)(West 2000)(the "INA").

2

decline to substitute a different interpretation for the BIA's, and therefore affirm the BIA's denial of the Petitioners' petitions for the suspension of deportation.

## I.  *Facts and Proceedings*

A.  <u>Milne</u>

Milne is a 38-year old female native and citizen of Iran.  She was admitted to the United States on July 24, 1978 on a nonimmigrant student visa and gained authorization to remain in the U.S. until May 31, 1983 by changing her status to that of a spouse of a nonimmigrant student. When that time elapsed, the Immigration and Naturalization Service ("INS") commenced deportation proceedings against her by serving her with a notice to appear.  Eventually, an immigration judge (IJ) denied Milne's request for asylum, ruling, <u>inter</u> <u>alia</u>, that she failed to demonstrate that she would suffer extreme hardship if deported. The IJ entered an order allowing 90 days for her to depart voluntarily and, alternatively, for her to be deported should she fail to do so.  Milne appealed that decision to the BIA.

The BIA affirmed the IJ's decision in a <u>per</u> <u>curiam</u> opinion in 1992 and reinstated an order allowing 30 days for voluntary departure, again with an alternate order of deportation.  Milne  appealed that decision to us, and we affirmed the BIA's decision in an unpublished opinion.[3] She then filed a motion with the BIA to reopen her appeal, claiming that facts arising after the initial BIA decision — specifically, her

---

[3] <u>Mandonna Kashanian McBride v. INS</u>, 995 F.2d 222 (1993).

3

remarriage to a United States citizen by whom she had borne a child in 1993 —— established that she would indeed experience extreme hardship if deported.[4]  The BIA denied this motion in 1997 without reaching the merits, finding that § 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"),[5] rendered Milne ineligible for reopening as a matter of law because she had not established seven years of continuous physical presence here.  In so ruling, the BIA relied on its decision in <u>Matter of N-J-B-</u> as precedent.[6]  Milne now appeals the BIA's decision to us.

B.  <u>Pixley</u>

Pixley is a 43-year old female native and citizen of Iran who entered this country on October 21, 1985 as a nonimmigrant visitor for pleasure and has resided here ever since.  An order to show cause was issued against her on January 9, 1991, alleging that she was deportable under § 241(a)(9)(B) of the INA because she had gained conditional resident status through a fraudulent marriage to a United States citizen.  In January of 1993, the INS withdrew that allegation but left

---

[4] Milne was divorced from the nonimmigrant student she married prior to 1983.  She then married a U.S. citizen but we found, in our above-said unpublished opinion, that she had admitted that it was a marriage of convenience.  After another divorce, she married her current husband, a marriage that is uncontested as "bona fide."  Her request for legal permanent resident status based on this marriage was denied under INA § 204(c) which precludes approval based on even an admittedly good-faith union if the petitioner had previously contracted an improper marriage.

[5] 8 U.S.C. § 1101 note (West 2000).

[6] Int. Dec. 3309 (BIA 1997).

4

in place a charge that Pixley had failed to convert her status from conditional to permanent within the required two years. Pixley then filed for suspension of deportation under former § 244(a) of the INA.[7]

In August of 1993, an IJ denied Pixley's claim for failure to establish the required seven years continuous physical presence in the United States during which the alien must demonstrate good moral character. Although Pixley had been continuously present for more than the requisite seven years, she was found not to have demonstrated good moral character during that time because she had falsely represented under oath that she was living with her husband at the time she received conditional residential status. Pixley appealed that decision to the BIA, claiming that the record did not show that her alleged misrepresentation had been made orally and under oath as required by relevant case law defining what constitutes a bar to the showing of good moral character. She subsequently petitioned for suspension of deportation on the ground that she had demonstrated a new period of seven years physical presence and good moral character, all accruing while her case was pending before the BIA and after the date of her alleged misrepresentation. Following additional briefing that addressed the 1998 changes in the law governing suspension of deportation, the BIA dismissed Pixley's appeal. It held that her initial period of continuous physical presence had been terminated by the commencement of deportation proceedings against her; however, the BIA's opinion did not

---

[7] 8 U.S.C. § 1254(a) (West 2000).

address Pixley's claim that she had accrued seven years of continuous presence as a person of good moral character following the commencement of those deportation proceedings.[8]

## II. *Analysis*

### A. Standard of Review

We defer to an agency's interpretation of a federal statute unless that interpretation violates "the unambiguously expressed intent of Congress."[9] We also note that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'"[10]

### B. The Attorney General's Action

Milne argues that because the BIA decision denying her claim was based on an earlier BIA decision that was vacated subsequent to the decision in her case, we should either reverse the BIA's decision in her case or remand it to the BIA for reconsideration. In the proceedings against Milne, the BIA had ruled that she could not petition for suspension of deportation because she was not continuously present in the United States for at least seven years before commencement of

---

[8] The government does not contest that each petitioner has been continuously present in the United States for more than seven years after being served with an order to show cause and have demonstrated good moral character during that time.

[9] Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984).

[10] INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999) (quoting INS. v. Abudu, 485 U.S. 94, 110 (1988)).

6

deportation proceedings against her.  In so ruling, the BIA did rely on its previous decision in N-G-B-, a decision interpreting the stop-time rule, the construction of which is the crux of the substantive decision to be made in these two cases.

The Attorney General referred N-G-B- to herself for review and vacated that decision in July of 1997.[11]  In November of that year, Congress enacted the Nicaraguan and Central Relief Act of 1997 (the "NACARA"),[12] which, inter alia, amended and clarified the IIRIRA with respect to the issue raised in N-G-B-.  Thereafter, in Matter of Nolasco,[13] the BIA made clear that in enacting the NACARA Congress had codified the substance of the BIA's holding in N-G-B- to the effect that the stop-time rule did apply to applications for suspension of deportation.  Recently, in In re Mendoza-Sandino,[14] the BIA interpreted § 240A(d)(1) as providing that once continuous physical presence is interrupted by service of a notice of deportation proceedings, the seven-year clock not only stops but never starts to run anew either.

Milne's claim is unavailing.  The basis of the BIA's decision was made clear, and, even though the supporting decision it cited was subsequently vacated, the substance of the vacated decision was reaffirmed by the BIA when it interpreted the new legislation enacted

---

[11] 74 Interpreter Releases 1210 (August 11, 1997).

[12] 8 U.S.C. 1101 note (West 2000).

[13] Int. Dec. 3385 (BIA 1999).

[14] In re Mendoza-Sandino, Int. Dec. 3426 (BIA 2000).

by Congress in response to the Attorney General's reversal of the BIA's decision in N-G-B-. Moreover, its recent decision in In re Mendoza-Sandino, interpreting the stop-time rule to bar a fresh start of the seven-year clock after service of a notice to appear, further clarifies the BIA's stance on this issue. Remanding this case to the BIA would therefore be a fruitless exercise.

C. Interpretation of the Stop-Time Rule

Currently, under the IIRIRA an alien who has been continuously present in the United States for ten years prior to the commencement of deportation proceedings against him and can meet other restrictive requirements is eligible to petition for suspension of his deportation order.[15] The transitional provisions of the IIRIRA specify that all such proceedings that had commenced prior to April 1, 1997 — including those that were initiated under former INA § 244 (pursuant to which each of the instant cases were brought) — are left intact under then-existing law.[16] Former § 244(a) of the INA vested the Attorney General with discretion to grant suspension of an alien who

> is deportable [and]. . .has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien

---

[15] 8 U.S.C. § 1229b(b) (West 2000).

[16] 8 U.S.C. § 1101 note (West 2000).

lawfully admitted for permanent residence[.][17]

Section 309(c)(5) of the IIRIRA states that § 240A(d)(1) of the INA, which cuts off accrual of continuous physical presence at the time deportation proceedings commence, applies regardless of whether the proceedings in question began on, before, or after the effective date of the IIRIRA. N-G-B- clarified the constitutionality of this rule, holding that the IIRIRA applies retroactively to foreclose relief in all such cases.[18] After the Attorney General vacated N-G-B-, Congress essentially reenacted it with the passage of the NACARA.[19]

The statutory provision in question here, the stop-time rule of INA 240A(d)(1),[20] does not expressly address the instant issue, i.e., whether the seven-year clock restarts and the accrual of continuous physical presence recommences after notice of the commencement of deportation proceedings against the alien in question is served. When "Congress has not directly addressed the precise question at issue," but an administrative agency has interpreted a statute to answer that question, we do not "simply impose [our] own construction on the statute, as would be necessary in the absence of an administrative

---

[17] 8 U.S.C. § 1254(a) (1994) (emphasis added).

[18] We too have upheld the retroactivity of this rule as constitutional. Moosa v. INS, 171 F.3d 994, 1007 (5th Cir. 1999).

[19] 8 U.S.C. § 1101 note (West 2000).

[20] This rule states: "For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear. . ." 8 U.S.C. § 1229b(d)(1)(West 2000)(emphasis added).

9

interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[21]

The BIA has interpreted the stop-time rule as prohibiting the seven-year clock from starting to tick again once proceedings against the alien have commenced.[22]  The BIA held that "the continuous physical presence clock does not start anew after the service of an Order to Show Cause so as to allow an alien to accrue the time required to establish eligibility for suspension of deportation subsequent to the service of an Order to Show Cause."[23]  The BIA based its interpretation on "the language of section 240A(d)(1) of the Act and the legislative history of the IIRIRA."[24]

Reading § 240A(d)(1) in the larger context of § 240A(d) as a whole, the BIA concluded that

> [t]he language of section 240A(d) makes it clear that Congress appreciated the difference between a "break" in continuous physical presence and the "end" of continuous physical presence.  Congress has distinguished between certain actions that "end" continuous physical presence, i.e., service of a charging document or commission of a specified crime, and certain departures from the country that only temporarily "break" that presence.  Service of an Order to Show Cause or a notice to appear is not

---

[21] Chevron, 467 U.S. at 843.

[22] In re Mendozo-Sandino, Int. Dec. 3426 (BIA 2000).

[23] Id.

[24] Id.

10

included as an interruptive event under section 240A(d)(2), which merely breaks continuous physical presence. Rather, under section 240A(d)(1), such service is deemed to end an alien's presence completely. Therefore, a reading of section 240A(d)(1) that would allow an alien to accrue a new period of continuous physical presence after the service of a charging document is not supported by the language of either section 240A(d)(1) or (2).[25]

The BIA also focused on the legislative history of § 240A(d)(1), finding that "[t]he [Conference Report's] Joint Explanatory Statement [of the Committee of Conference on the Illegal Immigration Reform and Immigrant Responsibility Act of 1996] reflects that the legislators understood that a break in continuous physical presence differs from the termination of continuous physical presence. The Joint Explanatory Statement distinguishes between events that merely break continuous physical presence, such that the clock may be reset for a new period of continuous physical presence to begin, and events that cause continuous physical presence to terminate forever."[26]  The BIA pointed out that its reading of § 240A(d)(1) is also "consistent with the House Report in which the House expressed concern about the ways in which aliens extended their stays in this country to accrue time to gain immigration benefits."[27]

---

[25] In re Mendozo-Sandino.

[26] Id.

[27] Id. In reaching this conclusion, the BIA discussed the House Report on the IIRIRA which stated that:
Each of these forms of relief may be exploited by illegal aliens to extend their stay in the United States. Voluntary departure is subject to abuse because there is

11

The BIA concluded that "[t]he House and Conference Reports make it clear that the legislators intended to remove the incentive for aliens to prolong their cases in the hope of remaining in the United States long enough to be eligible for relief from deportation."[28]

For purposes of review by a federal appellate court, the BIA's interpretation of the stop-time rule clearly meets Chevron's requirement that the agency's construction be "based on a permissible construction of the statute."[29] Although the BIA's reading of the statute is not the only one possible or necessarily even the best possible reading, it is certainly a credible one. That reading accounts for the language

> very little assurance that aliens actually leave the United States, and very little incentive for them to do so. . . . .Asylum is often claimed by persons who have not suffered persecution, but who know that delays in adjudication (particularly in the affirmative asylum system) will allow them to remain in the United States indefinitely, meanwhile accruing time so that they will be eligible for suspension of deportation if they are ever placed in deportation proceedings.

> Suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued. This includes aliens who failed to appear for their deportation proceedings and were ordered deported in absentia, and then seek to re-open proceedings once the requisite time has passed. Such tactics are possible because some Federal courts permit aliens to continue to accrue time toward the seven year threshold even after they have been placed in deportation proceedings. Similar delay strategies are adopted by aliens in section 212(c) cases, where persons who have been in the United States for a number of years, but have only been lawful permanent residents for a short period of time, seek and obtain this form of relief. H.R. Rep. No. 104-469.

[28] In re Mendozo-Sandino.

[29] Chevron, 467 U.S. at 843.

12

employed by Congress and is well supported by the legislative history of the stop-time rule as well as by the other legislation in this realm of the immigration law's structure. We base this conclusion on our careful review of the BIA's decision in In re Mendozo-Sandino, other relevant case law, and the arguments of the parties in their appellate briefs. Our conclusion is bolstered by additional evidence of the intent of Congress regarding the stop-time rule as set forth in a memorandum prepared by the Senate Appropriations Committee to explain the NACARA amendments. That report notes that:

> Under the rules in effect before [the IIRIRA amendments], [an] otherwise eligible person could qualify for suspension of deportation if he or she had been continuously physically present in the United States for seven years, regardless of whether or when the Immigration and Naturalization Service had initiated deportation proceedings against the person through the issuance of an order to show cause ("OSC") to that person. As a result, people were able to accrue time toward the seven-year continuous physical presence requirement after they already had been placed in deportation proceedings. IIRIRA changed that rule to bar additional time accruing after receipt of a "notice to appear," the new document the Act created to begin "removal" proceedings.[30]

In adopting the NACARA, Congress intended to prevent aliens from accruing additional time needed to reach the requisite seven years of continuous physical presence that they may have lacked when the proceedings against them were commenced. We have been cited to nothing and have found nothing on our own to indicate that Congress meant for a different rule to apply for the starting of a new seven-year count

---

[30] 143 Cong. Rec. S12265-226, available at 1997 WL 69386.

13

after the clock has been stopped and the pre-stop accrual of time has been obliterated. Congress is well aware that, "[i]n administering this country's immigration laws, the Attorney General and the INS confront an onerous task even without the addition of judicially augmented incentives to take meritless appeals, engage in repeated violations, and undertake other conduct solely to drag out the deportation process."[31] Given its professed intention of eliminating the incentive for aliens to engage in such behavior, Congress is not likely to have meant to permit aliens to start over and accrue the entirety of their seven years presence here following termination of the initial period of accrual. Congress has expressed a desire to reduce the time that an alien can prolong his stay following issuance of a deportation order, a goal clearly furthered by the BIA's interpretation of the stop-time rule.

### III. *Conclusion*

We accord substantial weight to the manner in which federal agencies interpret the laws that Congress has entrusted to their administration. Our review of the BIA's decision and the language and legislative history of the stop-time rule satisfies us that the BIA's

---

[31] INS v. Rios-Pineda, 471 U.S. 444, 450-51 (1985). It should be noted that although we generally agree that policy considerations support the BIA's interpretation, those policy implications may not be as serious as the INS asserts. Although Petitioners' interpretation of the stop-time rule does provide aliens with a somewhat perverse incentive structure, their strong desire to remain in this country provides them with those same incentives, namely to prolong their stay in the United States using any (legal) means available.

interpretation —— that an alien does not begin to accrue a new seven-year period of continuous presence in the United States after receiving notice that deportation proceedings have commenced —— is a reasonable one.   Given the deference that we must accord to the BIA's interpretations of federal immigration law, we are bound to uphold such interpretations unless they are unreasonable.   Discerning nothing unreasonable in the BIA's interpretation of the stop-time rule, we affirm the decisions of the BIA in the captioned cases.

AFFIRMED.